# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3140 | **DATE** | 12/14/2001 |
| **CASE TITLE** | James J. Hackett vs. Xerox Corporation, etc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' motion for summary judgment is granted and Plaintiff's motion for summary judgment is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | DEC 1 7 2001 | | |
| | Notified counsel by telephone. | | date docketed | | 125 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | | |
| ✓ | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| EF | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



DOCKETED

DEC 1 7 2001

| | |
|---|---|
| JAMES J. HACKETT | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| XEROX CORPORATION LONG-TERM | ) |
| DISABILITY INCOME PLAN, XEROX | ) |
| CORPORATION, XEROX CORPORATE | ) |
| REVIEW DISABILITY PANEL, PLAN | ) |
| ADMINISTRATOR for the Xerox | ) |
| Corporation Long-Term Disability Income | ) |
| Plan, HEALTH INTERNATIONAL, INC., | ) |
| and ELLIOTT WOLF, M.D. and LANCE | ) |
| HOLEMON, M.D., as agents of Health | ) |
| International, Inc. | ) |
| Defendants. | ) |

Case No. 00 C 3140
HONORABLE CHARLES R. NORGLE

DEC 1 7 2001

## ORDER AND OPINION

CHARLES R. NORGLE, Sr., District Judge:

Before the court are Defendants' motion for summary judgment and Plaintiff's cross-motion for summary judgment. For the following the reasons, Defendants' motion is granted and Plaintiff's motion is denied.

## I. BACKGROUND[1]

This case involves claimed violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., arising out of the termination of long-term disability benefits. In October of 1985, Plaintiff, James J. Hackett ("Hackett"), began employment with Defendant, Xerox ("Xerox"), as a sales representative. Hackett, within a year of his initial employment, experienced emotional problems and began to see a psychiatrist regularly. By

---

[1] The court takes the facts from the parties Local Rule 56.1 statements and accompanying briefs. Disputed facts are noted in the text.



March of 1987 Hackett's emotional problems began to interfere with his ability to work. Frank H. Brunstetter, M.D. ("Dr. Brunstetter"), the disability physician for the office of Clinical and Disability Services at Xerox, after consulting with Hackett's treating psychiatrist, John P. Gerber, M.D. ("Dr. Gerber"), advised Hackett that disability status was appropriate and encouraged him to apply for long-term disability benefits under the Xerox Long-Term Disability ("LTD") Plan. As part of the application for disability benefits, Hackett was reexamined by Dr. Gerber to ascertain a formal diagnosis. Dr. Gerber found that Hackett suffered a serious psychiatric condition, a personality disorder coupled with neurotic depression, which prevented him from doing any type of work. As of March 2, 1987, Hackett qualified for, and began receiving long-term disability benefits from Xerox. Over the next twelve years Hackett saw numerous different psychologists and psychiatrists who all performed evaluations. Each different psychologist or psychiatrist reached varying diagnoses of mental illness, but with the same conclusion that Hackett was unable to work. Hackett continued to qualify and receive full disability benefits under Xerox's LTD Plan.[2]

In 1989, Xerox advised Hackett that as a condition to his continuing to receive long-term disability benefits he was required to apply for social security disability benefits. After an unsuccessful application for disability benefits to the Social Security Administration, Hackett appealed and in May of 1996 was granted disability status and benefits, retroactive to March 2, 1987. Xerox provided legal counsel to Hackett in connection with the successful application for

---

[2] It is disputed between the parties exactly what LTD plan is in effect. The court addresses this issue in detail. (See supra, pp. 8-18.)

social security disability benefits. Additionally, the social security disability benefits retroactively awarded were paid to Xerox.

Hackett received LTD benefits and social security disability from May of 1996 until January of 1999. On January 2, 1999, Defendant, Health International ("HI")[3], determined that Hackett was no longer eligible for long-term disability benefits. Hackett appealed this initial determination and on May 5, 1999 a final and binding determination denied disability benefits. The final determination relied upon: (1) medical evaluations from two psychiatrists stating that although Hackett suffered from a mental illness, it did not prohibit him from working; and (2) material contained in the administrative record.

Hackett alleges that the denial of long-term disability benefits is an arbitrary cessation. Hackett filed a six count complaint alleging violations of ERISA by the following actions: (1) failure to timely provide requested documents; (2) breaches of fiduciary duty; (3) failure to follow applicable plan requirements; (4) improper claim and appeal procedures; (5) denial of benefits; and (6) conflict of interest. Both parties now move for summary judgment, arguing that there are no disputed issues of fact, and they are entitled to judgment as a matter of law.

## II. DISCUSSION

### A. Judicial Estoppel

Initially, the court must address the question of judicial estoppel. The doctrine of judicial estoppel provides a party that has won a suit on one ground may not turn around and in another case obtain another judgment on an inconsistent ground. Bethesda Lutheran Home and Services,

---

[3] Defendants include several business entities as well as individuals. For simplicity, the court will refer to Defendants as either "Xerox" or "HI" as the situation calls for.

Inc. v. Born, 238 F.3d 853, 857-58 (7th Cir. 2001) (citing Saecker v. Thorn, 234 F.3d 1010, 1014-15 (7th Cir. 2000); Moriarty v. Sve, 233 F.3d 955, 962 (7th Cir. 2000); Lydon v. Boston Sand & Gravel Co., 175 F.3d 6, 12-13 (1st Cir. 1999)). If such repudiation were permitted, the incentive to commit perjury and engage in other litigation fraud would be greater. McNamara v. City of Chicago, 138 F.3d 1219, 1225 (7th Cir. 1998) (citing Chaveriat v. Williams Pipe Line Co., 11 F.3d 1420, 1428 (7th Cir. 1990)). Judicial estoppel requires, however, that the party sought to be estopped have obtained a favorable judgment or settlement on the basis of a legal or factual contention that the party wants to repudiate in the current litigation. McNamara, 138 F.3d at 1225. The purpose behind judicial estoppel "is to protect the judicial system from being whipsawed with inconsistent arguments and to discourage the form of fraud that consists of withholding your best ground in the first of a series of suits because it is helpful to your opponent in that suit hoping to win that suit on a different ground and then spring your inconsistent best ground in a later suit in order to obtain additional relief." Bethesda Lutheran, 238 F.3d at 858.

Hackett argues that Xerox is judicially estopped from denying him long-term disability benefits based on the fact that Xerox agreed and aided Hackett in successfully applying for social security benefits. (Pl.'s Mem. In Opp'n to Defs.' Mot. for Summ. J. and in Supp. of Cross-Mot. for Summ. J., p.11.) Hackett relies on Ladd v. ITT Corp., 148 F.3d 753 (7th Cir. 1998), for the foundation of his argument. The Ladd case involves an ERISA suit brought by a plan participant who was denied disability benefits. See Ladd, 148 F.3d at 753-755. The plaintiff, Ladd, suffered nerve damage to her neck and both wrists when a shelving unit fell on her at work. Id. Ladd immediately began the process of applying for disability benefits. Id. As

4

part of that process, the defendant, ITT Corporation, encouraged and aided Ladd in applying for social security disability benefits. Id. With legal aid from ITT, Ladd was able to demonstrate to the Social Security Administration she was totally disabled. Id. Within a short period of time after the Social Security Administration's decision, ITT turned around and determined Ladd was not totally disabled and denied her disability benefits. Id. The Seventh Circuit held the denial of disability benefits was arbitrary and "even irrational." Ladd, 148 F.3d at 755. The court stated "no one who examined Ladd, including the doctor selected by [ITT] to examine her, believed that she was capable of working . . . the uncontradicted evidence is that Ladd's condition was worse when [ITT] denied her claim then it had been when the Social Security Administration granted it." Id. at 755-56. In terms of judicial estoppel the court held it was "technically not applicable," because ITT was not a party to a previous action involving Ladd's benefits; rather, it was the spirit of the doctrine that was worthy of consideration. See id. at 756. The court stated the aid of ITT and subsequent granting of social security disability benefits "has an additional significance," but was not the deciding factor. Id. Rather, ITT's actions of helping Ladd obtain social security benefits and then turning around and denying disability benefits "cast[] additional doubt on the adequacy of the evaluation of Ladd's claim even if it [did] not provide an independent basis for rejecting that evaluation." Ladd, 148 F.3d at 756.

A comparison between Ladd and the case at bar reveals several telling differences. First, it must be pointed out that in Ladd the Seventh Circuit did not rule that judicial estoppel applied. See id, 148 F.3d at 756. Rather, it addressed Ladd considering the "spirit" of judicial estoppel. Id. Thus, when Hackett argues that judicial estoppel prevents Xerox from taking such inconsistent positions, there is no authoritative support for such an argument. Xerox was never a

party to any previous action involving Hackett's benefits and even though Xerox supported Hackett in his application for disability benefits it is of only "additional significance." See id. Second, the position taken by Xerox is neither inconsistent nor "irrational" as it was in Ladd. Id. at 755. Hackett was determined disabled by the Social Security Administration in May of 1996, but it was not until January of 1999 that Hackett was denied disability benefits by Xerox. (Defs.' Rule 56.1 Statement, ¶ 14, p. 33; Pl.'s Rule 56.1 Statement, ¶ 14, p. 11; R. 52, 85, 108, 109.)[4] In that intervening time, Hackett's situation changed. Two separate board certified psychiatrists determined that Hackett was able to work. (R. 002 - 010, 78, 080-081, 160-166, 193, 234.) Thus, Xerox should not be estopped from denying disability benefits, where circumstances have changed over several years and in light of the current medical evidence. Further, Xerox's position cannot be considered inconsistent, since at the time that Hackett applied for social security disability the medical evidence indicated that he was disabled. (Id.) It was only in January of 1999, again, three years after the award of social security disability, that new medical evaluations determined that Hackett was no longer totally disabled. In conclusion, even though Ladd brings the doctrine of judicial estoppel into the realm of consideration, it is not legally viable, nor is it applicable in spirit when the actions of a party, against whom judicial estoppel is sought, are not inconsistent. The court rejects the judicial estoppel argument.

## B. Standards for Summary Judgment

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The

---

[4] The court will refer to Defendant's Exhibit 2B of the affidavit of Mary Jo Jerde as the record since it is HI's administrative record that was established in connection with the denial of disability benefits, e.g. (R. 160-166.)

nonmoving party cannot rest on the pleadings alone, but must identify specific facts, <u>see</u> <u>Cornfield v. Consolidated High School District No. 230</u>, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. <u>See</u> <u>Murphy v. ITT Technical Services, Inc.</u>, 176 F.3d 934, 936 (7th Cir. 1999); <u>see also</u> <u>Shank v. William R. Hague, Inc.</u>, 192 F.3d 675, 682 (7th Cir. 1999) (stating that a party opposing summary judgment must present "what evidence it has that would convince a trier of fact to accept its version of events"). A defendant is entitled to put the plaintiff to his proofs and demand a showing of the evidence. <u>See</u> <u>e.g.</u> <u>Navarro v. Fuji Heavy Industries. Ltd.</u>, 117 F.3d 1027, 1030 (7th Cir. 1997). If the plaintiff fails to come up with the required proof, the defendant is entitled to summary judgment. <u>See</u> <u>id.</u> It bears repeating that the plaintiff must present evidence, rather than speculation and conclusions without factual support. <u>See</u> <u>Rand v. CF Industries. Inc.</u>, 42 F.3d 1139, 1146-47 (7th Cir. 1994).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. <u>See</u> <u>Bombard v. Fort Wayne Newspapers. Inc.</u>, 92 F.3d 560, 562 (7th Cir. 1996). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the party opposing summary judgment. <u>See</u> Fed. R. Civ. P. 56(c); <u>Perdomo v. Browner</u>, 67 F.3d 140, 144 (7th Cir.1995). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." <u>See</u> <u>United States v. Diebold. Inc.</u>, 369 U.S. 654, 655 (1962); <u>First Nat'l. Bank of Arizona v. Cities Service Co.</u>, 391 U.S. 253, 280 (1968); <u>Wolf v. Buss (America) Inc.</u>, 77 F.3d 914, 922 (7th Cir. 1996). The choice between reasonable inferences from facts is a jury function. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255

(1986). The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. <u>Waldridge v. Amercian Hoechst Corp.</u>, 24 F.3d 918, 920 (7th Cir. 1994) (citing <u>Anderson</u>, 477 U.S. at 249-50; 10 Charles A. Wright, Arthur R. Miller & Mary K. Kane, <u>Federal Practice and Procedure: Civil</u> § 2712, at 574-78 (2d ed. 1983)).

## C. Merits

As part of the court's decision to grant summary judgment in favor of Xerox, an analysis of several issues is necessary. First, the court has to determine what standard of review to apply to the denial of disability benefits under ERISA, de novo or a more deferential standard. This determination is dependent upon the language contained in the LTD plan. In order to identify the correct language, the court must establish the LTD plan that was in effect. The end result is application of the deferential standard of arbitrary and capricious. Application of the arbitrary and capricious standard reveals that Xerox is entitled to summary judgment because the decision to deny disability benefits was not unreasonable. Even with Hackett's numerous collateral challenges to the reasonableness of the decision, including arguments involving full and fair review, violation of a service agreement, failure to provide required plan materials, conflict of interest, and breach of fiduciary duty, Xerox is still entitled to summary judgment.

### 1. Standard of Review

The initial issue facing the court is what standard of review to apply to Xerox's denial of LTD benefits to Hackett. As mentioned previously, this determination requires the court establish what LTD plan was in effect. It is disputed between the parties exactly which LTD plan was in effect. Hackett claims the LTD plan in effect was the 1987 Disability Policy ("1987

Policy"). Xerox claims that the plan in effect was the 1996 LTD Plan ("1996 Plan") which was an amendment to the 1977 LTD Plan ("1977 Plan").[5] The court first discusses the general types of judicial review, and then analyzes which plan is in effect.

ERISA was enacted "to promote the interests of employees and their beneficiaries in employee benefit plans," Shaw v. Delta Airlines, Inc., 463 U.S. 85, 90 (1983), and "to protect contractually defined benefits." Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 148 (1985); see generally 29 U.S.C. § 1001 et seq. (setting forth congressional findings and declarations of policy regarding ERISA). ERISA provides "a panoply of remedial devises" for participants and beneficiaries of benefits plans. Firestone Tire and Rubber Co. v. Brunch, 489 U.S. 101, 106 (1989) (citing Massachusetts Mutual Life Ins. Co., 473 U.S. at 146).

The Supreme Court held in Firestone that a "de novo standard of review applies regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest." Firestone, 489 U.S. at 115 (citing Restatement (Second) of Trust § 187, Comment d (1959)). Further, the Seventh Circuit has stated "[t]he [Firestone] case makes plenary review the default rule, that is, the rule to govern when the plan documents contain no indication of the scope of judicial review; and it is a natural and modest extension of [Firestone], or perhaps merely a spelling out of an implication of it, to construe uncertain language concerning the scope of judicial review as favoring plenary review as well." Herzberger v. Standard Insurance Co., 205 F.3d 327, 330 (7th Cir. 2000); see also O'Reilly v. Hartford Life & Accident Ins. Co., – F.3d –, No. 00-3760, 2001 WL 1518765 (7th Cir. Nov. 30, 2001). However "an ERISA plan can likewise specify that the

---

[5] Plaintiff refers to the 1977 Plan as the "1978 Plan" in a majority of his pleadings. The court will refer to the plan as the 1977 Plan since that is the year it became effective.

administrator has discretion in interpreting or applying it . . . but the conferral of discretion is not to be assumed." Herzberger, 205 F.3d at 331. Discretion is only entitled when the language of the plan provides it. See id.; see also O'Reilly, 2001 WL 1518765 at *2. The Seventh Circuit has suggested such "safe harbor" language that would assure that the administrator has sole discretion, however, such language is not mandatory nor can it be considered magic words. See Herzberger, 205 F.3d at 331 (The 'safe harbor' language suggested by the Seventh Circuit is the following: "Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them.") Rather, "in some cases the nature of the benefits or the conditions upon it will make reasonably clear that the plan administrator is to exercise discretion." Id. "In others the plan will contain language that, while not so clear as our 'safe harbor' proposal, indicates with the requisite of minimum clarity that a discretionary determination is envisaged." Id. If the administrator does have discretion, then the court reviews the administrator's decision from the perspective of an arbitrary and capricious standard. See Herzberger, 205 F.3d 331-32.

Obviously, then the court must look to the language of the plan to determine its standard of review. A significant issue arises when the court looks to the language of the plan to determine the standard of review, namely which LTD plan is in effect.

As stated before, it is disputed between the parties exactly which LTD plan is in effect. In October of 1978, Xerox executed a "Long Term Disability Income Plan" effective to August 1, 1977. (Compl., Ex. 1, p. 1.) This plan was amended several times over the years. (Compl., Ex. 1, pp. 8-10.) The most recent amendment, in terms of the context of this action, was in June of 1997 to be effective August 1, 1996. (Compl., Ex. 2, pp. 1, 19.) Hackett claims the LTD plan

in effect is the 1987 Policy. Xerox claims that the plan in effect is the 1996 Plan which was an amendment to the 1977 Plan.

Judge Posner has written that "this kind of confusion is all too common in ERISA land." Health Cost Controls of Illinois, Inc. v. Washington, 187 F.3d 703, 712 (7th Cir. 1999). The terms of ERISA plans sometimes "must be inferred from a series of documents none clearly labeled as 'the plan.'" Id. (referring to Milwaukee Area Joint Apprenticeship Training Comm. v. Howell, 67 F.3d 1333, 1338 (7th Cir. 1995); Horn v. Berdon, Inc. Defined Benefit Pension Plan, 938 F.2d 125 (9th Cir. 1991) (per curiam)). In Health Cost Controls, the Seventh Circuit faced the issue as to what was encompassed within the plan. Health Cost Controls, 187 F.3d at 712. The court looked to surrounding evidence to establish the plan. See id.

In this case, the court must consider several factors, including vesting, amendments, and accrual of a cause of action. Welfare plans, such as an LTD, are specifically exempted from vesting requirements to which pension plans are subject. 29 U.S.C. § 1051(1); see Curtiss-Wright Corp. v. Schoonejngen, 514 U.S. 73, 78 (1995). Employers "are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans. Curtiss-Wright Corp., 514 U.S. at 78. But, employers may provide for the vesting of benefits by written contract, so that the benefits are fixed. See Land v. Chicago Truck Drivers Helpers & Warehouse Workers Union Health & Welfare Fund 1994, 25 F.3d 509, 514 (7th Cir. 1994) (citing Bidlack v. Wheelabrator Corp., 993 F.2d 603, 605 (7th Cir. 1993)); Senn v. United Dominion Indus., Inc., 951 F.2d 806, 814 (7th Cir. 1992). Accordingly, whether welfare benefits have vested must be determined by the text of the governing plan documents. Senn 951 F.2d at 814; Ryan v. Chromalloy Am. Corp., 877 F.2d 598, 602 (7th Cir. 1989).

The Seventh Circuit has stated that "an employee's entitlement to such benefits expires with the agreement creating the entitlement, rather than vesting, but the presumption can be knocked out by a showing of genuine ambiguity, either patent or latent, beyond silence." Rossetto v. Pabst Brewing Co., Inc., 217 F.3d 539, 543 (7th Cir. 2000) (citing Bidlack, 993 F.2d at 606-07).[6] Further, the court stated the "presumption against vesting, it is important to emphasize, kicks in only if all the court has to go on is silence." Rossetto, 217 F.3d at 544. "If there is some positive indication of ambiguity, something to make you scratch your head (but the "something" must be either language in the plan or contract itself or the kind of objective evidence that can create a latent ambiguity under principles of contract law, Murphy v. Keystone Steel & Wire Co., 61 F.3d at 565), the presumption falls out." Rossetto, 217 F.3d at 544. The presumption against vesting is thus a default rule, that is, a rule to be applied when there is no other evidence. Id. (citing Bidlack, 993 F.2d at 609; E. Allan Farnsworth, Contracts, § 7.16, pp. 499. (3d ed. 1999)).

---

[6] The Seventh Circuit in Rossetto has defined patent and latent ambiguity as follows:

> A latent ambiguity is an ambiguity (that is something that makes it possible to interpret a document reasonably in more than one way, e.g., Anstette v. Eagle Picher Industries, Inc., 203 F.3d 501, 503 (7th Cir. 2000); Bourke v. Dun & Bradstreet Corp., 159 F.3d 1032, 1037 (7th Cir. 1998); Computrol, Inc. v. Newtrend, L.P., 203 F.3d 1064, 1070 (8th Cir. 2000) that is recognized as such only when a contract clear on its face – clear, that is, to the uniformed reader – is applied to a particular dispute. Stone Container Corp. v. Hartford Steam Boiler Inspection & Ins. Co., 165 F.3d 1157, 1162 (7th Cir. 1999) (other citations omitted).
>
> If even this innocent reader would find the contract unclear – if, that is, an ambiguity is apparent just from reading the contract without having to know anything about how it interacts with the world – then the contract has what is called a patent, or intrinsic, ambiguity, and evidence is admissible to cure it. E.g., Stone Container Corp. v. Hartford Steam Boiler Inspection & Ins. Co., supra, 165 F.3d at 1161-62; Home Ins. Co. v. Chicago & Northwestern Transportation Co., 56 F.3d 763, 767-68 (7th Cir. 1995).

Rossetto v. Pabst Brewing Co., Inc., 217 F.3d 539, 542-43 (7th Cir. 2000).

If a determination is made that a welfare plan does not vest rights and the plan may be amended, it is necessary to establish which plan is in effect. In order to ultimately determine what LTD plan is in effect, the court must identify when Hackett's cause of action arose. See Daill v. Sheet Metal Workers' Local 73 Pension Fund, 100 F.3d 62, 65 (7th Cir. 1996). The Seventh Circuit has stated that an ERISA plan participant's claim for relief accrues when his claim for benefits is denied. See id. Other circuits and district courts have also addressed the issue and have similarly concluded that "an ERISA cause of action based on a denial of benefits accrues at the time the benefits are denied." Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154, 1159 (9th Cir. 2001); see also Podolan v. Aetna Life Insurance Co., 909 F. Supp. 1378, 1384 (D. Idaho 1995) (action of plan administrator in denying benefits is when claim arises); Blessing v. John Deere & Co., 985 F. Supp. 899, 903 (S.D. Iowa 1997) (ERISA cause of action based on a denial of benefits accrues at the time the benefits are denied).

With these principles as a guide, the court examines Xerox's LTD Plans. On October 26, 1978, Xerox executed a document entitled "Xerox Long Term Disability Income Plan," (Compl., Ex. 1, p. 1.), which actually became effective on August 1, 1977. (Id.) The purpose of the 1977 Plan was "to provide disability benefits for covered employees and former employees of Xerox Corporation . . . ." (Id.) Significantly, the plan provides in Article 5, under the heading "Amendment or Termination of the Plan" the following:

> The company intends to continue the Plan described herein as a permanent program. However, the Company specifically reserves the right to amend, suspend or terminate the Plan described herein at any time and for any reason, except that no amendment, suspension or termination of the Plan shall affect benefits previously granted to participants, and provided further that no amendment of the Plan may be made which would permit any part

13

> of the Trust Fund to be used for or diverted to purposes other than
> for the exclusive benefit of the participants or which would
> diminish any rights accrued for the benefit of participants prior to
> the effective date of the amendment.

(Compl., Ex. 1, p. 6.)  Additionally, attached to the 1977 Plan are three documents, entitled Amendment No.1 executed September 20, 1979, Amendment No. 2 executed December 19, 1980, and Amendment No. 3 executed October 31, 1986.  The 1977 Plan was amended further in 1996 when a new document entitled "Long-Term Disability Income Plan" became effective. (Compl., Ex. 2, p. 1.)

It is painfully clear that the 1977 Plan allows not only amendment, but potentially termination of benefits.  This is obvious from the abovementioned language, as well as the fact that several amendments to the plan occurred within a short time period of the effective date of the 1977 Plan.  See Senn, 951 F.2d at 814; Ryan, 877 F.2d at 602; Rossetto, 217 F.3d at 543-544. What is more, Hackett does not dispute that the 1977 Plan could be amended, in fact he concedes amendment in order to argue that a later document is controlling.  (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., pp. 15-16; Pl.'s Reply Mem. in Supp. of Mot. for Summ. J., p. 7.)

As stated previously, the court looks to when a claim for benefits is denied to establish the cause of action under ERISA.  Daill, 100 F.3d at 65 (citing Tolle v. Carroll Touche, Inc., 977 F.2d 1129, 1138 (7th Cir. 1992)).  Hackett originally went on disability in 1987.  (See infra pp. 2-3)  Hackett was determined disabled by the Social Security Administration in 1996.  However, it is not until January of 1999 that Xerox denied Hackett's claim for disability benefits.  (See infra. pp. 2-3.)  Thus, Hackett's claim for relief against Xerox did not accrue until January of 1999.

The plan in effect at that time governs Hackett's benefits, the scope of the administrator's discretion, and this court's review of the administrator's decision.

Following this progression of analysis, the court addresses the 1996 Plan which is entitled "Xerox Corporation Long Term Disability Income Plan." (Compl, Ex. 2, p. 1.) The 1996 Plan states under Section 1.2 the following: "Effective Date. The original effective date of the Xerox Corporation Long-Term Disability Income Plan was August 1, 1977 . . . ." (Id.) The 1996 Xerox LTD Plan also contains the following language:

> The determination of whether an Employee has incurred a covered disability and has complied with all of the conditions for receiving, and continuation of, benefits shall be made by either the Medical Case Manager or the Disability Administrator, as appropriate, in its sole discretion.

(Compl., Ex. 2, p. 9.) Further, the 1996 Plan states the following under Article 8, section 8.1:

> The Company specifically reserves the right to amend, suspend or terminate the Plan describe herein at any time and for any reason, provided that no amendment of the Plan may be made which would permit any part of the Trust Fund to be used for or diverted to purposes other than for the exclusive benefit of Employees.

(Compl., Ex.2, p. 18.)

Hackett admits that the language contained in the 1996 Plan allows amendment and termination of the plan. (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot for Summ. J and Mem. in Supp. of Cross-Mot. for Summ. J., p. 17; Pl.'s Reply Mem. in Supp. of Mot. for Summ. J., pp. 8-10.) Even more significantly, Hackett admits the 1996 Plan contains language which grants the plan administrator or medical case manager discretion as to awarding of the benefits. (Pl.'s Mem. In Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., p. 17.) Thus, the 1996 Plan, with the admitted discretionary language, would be reviewed under

the deferential standard of arbitrary and capricious. See Herzberger, 205 F.3d at 331-332; see also O'Reilly, 2001 WL 1518765 at *2.

Hackett argues that the 1996 Plan is not the applicable plan. Hackett asserts that a personnel policy issued in 1987 vested, or froze, his benefits. The court rejects Hackett's arguments.

The 1987 Policy is actually entitled "Personnel Manual" with the identification number of PM 502.1. (Compl., Ex. 3, p. 1.) The 1987 Policy was effective on January 1, 1987, superceding PM 502.1 dated October 15, 1985. (Id.) The document provides a summary of its contents as "defin[ing] disability and establish[ing] practices to be followed in reporting employee absence from work due to illness or injury, processing claims for disability benefits, authorizing benefit payments, and returning employees to work following periods of disability." (Id.) As the summary indicated, the document defines disability as "the inability of an employee to be employed in any substantial and gainful work either inside or outside of Xerox because of personal impairment caused by injury or illness, occupational or non-occupational . . ." (Compl., Ex. 3, p. 4.) Additionally, under the heading of "Claims Practices" the document states that "[t]he policy in effect at the beginning of the disability shall govern all practices affecting the employee until the employee returns to work, terminates, or retires." (Compl., Ex. 3, p. 4.) Finally, the document describes the appeal steps available to a Xerox employee. (Compl., Ex. 3, p. 7.)

Hackett initially argues that Xerox admitted that the 1987 Policy is the governing plan when Xerox stated "Mr. Hackett began his long term disability on August 9, 1987. He is covered under the Plan in effect at that time." (Pl.'s Mem. In Opp'n to Defs.' Mot. for Summ. J.

and Mem. in Supp. of Cross-Mot. for Summ. J., p. 15.) Hackett also contends that Xerox wrote that "the long term disability policy that we sent you was the official plan document in effect in 1987." (Id.) Most importantly, Hackett argues the statement contained under the heading "Claim Practices" vest certain rights. (Id.) Specifically, Hacektt claims Xerox could not amend the 1987 Policy once Hackett went on disability and until he "returns to work, terminates, or retires." (Id.) Hackett claims that any amendment to the 1987 Policy would destroy his rights accrued under that plan. (Pl.'s Mem. In Opp'n to Defs.' Mot. for Summ. J. and in Supp. of Cross-Mot. for Summ. J., p. 21.) In contrast, Xerox argues that the 1987 Policy is not its LTD plan, but rather a personnel manual that sets applicable eligibility standards and thus has no bearing on this case. (Defs.' Reply Mem. in Supp of Mot. for Summ. J. and Resp. Mem in Opp'n to Pl.'s Cross-Mot. for Summ. J., pp. 12-13.) The court finds Xerox's argument persuasive.

It is obvious the 1987 Policy is not Xerox's LTD plan. The title of the document alone, "Personnel Manual," confirms this. Contrary to Hackett's position, Xerox does not admit that the 1987 Plan is the governing plan. A majority of Xerox's statements (see supra, pp. 16-17.) refer to a "plan" not a "policy." Additionally, all of Xerox's statements (id.) which Hackett presents as evidence, never specifically refer to the 1987 Policy as the LTD Plan. Rather, Hackett relies on unsupported inferences to agrue that Xerox admitted the 1987 Policy was the LTD Policy. Hackett has the burden to present evidence that could persuade a jury to accept his version of events. See Shank, 192 F.3d at 682; Navarro, 117 F.3d at 1030. His speculation is insufficient to defeat summary judgment. See Rand, 42 F.2d at 1146-47 (noting that something more than hunches and speculation is necessary to survive summary judgment).

Nevertheless, even if the court were to accept Hackett's position, it would find that the 1987 Policy does not vest rights in Hackett. Hackett's contention that the language "returns to work, terminates, or retires" constitutes unambiguous language that vests rights and denies Xerox the right to amend and or cancel the 1987 Policy is misguided. As stated previously, the 1987 Policy "defines disability and establishes practices to be followed in reporting employee absence from work due to illness or injury, process claims for disability benefits, authorizing benefit payments, and returning employees to work following periods of disability." (See supra, p. 16.) Xerox's LTD Plan incorporates the 1987 Policy, but Xerox's LTD Plan clearly states that the 1987 Policy can be changed from "time to time" and amended or terminated, which Xerox did in 1996. (Compl., Ex. 1, pp. 1-2.) Thus, there is no ambiguity in the 1987 Policy and the presumption against vesting is applicable. See Rossetto, 217 F.3d at 543-544. As a result, the court rejects Hackett's argument that the 1987 Policy controls, and the related argument that it should review the administrator's acts de novo.

In conclusion, the court looks to the 1996 Plan as the controlling LTD plan and applies the arbitrary and capricious standard. The 1996 Plan is the controlling plan because Hackett's claim for relief arose in January of 1999. Further, based on the discretionary language contained within the 1996 Plan, the court follows the arbitrary and capricious standard of review. The 1987 Policy is not an LTD plan, and even if it was, it does not vest rights which preclude its amendment.

### 3. Arbitrary and Capricious

"Under the arbitrary and capricious standard, it is not [the court's] function to decide whether [it] would reach the same conclusion as the Plan or even rely on the same authority."

18

Mers v. Marriott Int'l Group Accidental Death and Dismemberment Plan, 144 F.3d 1014, 1021 (7th Cir. 1998); see also Cvelbar v. CBI Ill. Inc, 106 F.3d 1368, 1379 (7th Cir. 1997). "[The court's] role is to determine whether the decision was completely unreasonable." Mers, 144 F.3d at 1021; see also Chojnacki v. Georgia-Pacific Corp., 108 F.3d 810, 816 (7th Cir. 1997); Van Boxel v. Journal Co. Employees' Pension Trust, 836 F.2d 1048, 1053 (7th Cir. 1987). A denial of benefits will not be set aside if it was based on a "reasonable interpretation of the plan documents." Mers, 144 F.3d at 1021; see also Loyola Univ. v. Humana Ins. Co., 996 F.2d 895, 898 (7th Cir. 1993). In determining whether an abuse of discretion has occurred, the court must determine not whether the administrator's decision is correct or whether the court would have answered the question differently, but instead whether the interpretation of the plan is unreasonable. See Ross v. Indiana State Teacher's Association, 159 F.3d 1001, 1009 (7th Cir. 1998); Mers, 144 F.3d at 1021. The Seventh Circuit has expressed its preference for the arbitrary and capricious standard:

> When the administrator is given discretion to interpret the terms of the plan, the "extent of the deference given the administrator 'determines the extent of judicial deference.'" Cozzie [v. Metropolitan Life Ins. Co.], 140 F.3d at 1107 (quoting Morton v. Smith, 91 F.3d 867, 870 (7th Cir. 1996)). This is the case because Firestone Tire "did not establish a single standard for reviewing the discretionary decisionmaking (sic) of plan fiduciaries" but instead "presented a 'smorgasbord of possiblities' for standards of review." Morton, 91 F.3d at 870.
> In Morton, this court differentiated between the arbitrary and capricious standard of review and the abuse of discretion standard. We stated that when plan administrators are constrained to make "reasonable" interpretations of a plan, "their decisions are reviewed according to the familiar abuse-of-discretion." Id. In contrast, we explained, whether the administrators need only "interpret the plan under the broad standard of good faith, their discretion is even more extensive, and judicial review is even more

> deferential." Id. In that case, the arbitary and capricious standard
> applies.
>    The distinction between these standards is indeed nebulous;
> in fact, we have (both before and since our decision in Morton)
> treated these standards of review, in this context, as substantially
> equivalent. See Gallo v. Amoco Corp., 102 F.3d 918, 921 (7th Cir.
> 1996) (stating that issue to be determined was whether "Amoco
> had abused its discretion, or what amounts to the same thing, had
> acted arbitrarily and capriciously") cert. denied, 521 U.S. 1129
> (1997).

Ross, 159 F.3d at 1008.

The court must determine whether HI's decision was reasonable under the definition for

disability provided in the 1996 Plan. Because this is a matter of interpretation of an ERISA plan,

the court looks to federal common law principles of contract interpretation to guide its inquiry.

See Ross, 159 F.3d at 1011 (citing Santealla v. Metropolitan Life Ins. Co., 123 F.3d 456, 461 (7th

Cir. 1997)). Thus, the court "interpret[s] the terms of the policy in an ordinary and popular

sense, as would a person of average intelligence and experience." Ross, 159 F.3d at 1011. The

1996 Plan defined disability as "the inability to be employed in any substantial and gainful work

either inside or outside of Xerox because of personal impairment caused by injury or illness,

occupational or non-occupational." (Compl., Ex. 2, p. 3.)

With this in mind, the court finds HI reasonably determined that Hackett was no longer

disabled. This determination was reached by the medical case manager with the support of a

medical examination of Hackett performed by Dr. Lance Holemon ("Dr. Holemon"), as well a

review of Hackett's medical records on appeal by Dr. Elliot M. Wolf ("Dr. Wolf").

After the initial conclusion by HI that Hackett was no longer disabled, a medical

examination was performed by Dr Holemon. Dr. Holemon's medical evaluation in October of

1998 concluded that Hackett was capable of returning to work. (R. 002-010, 160-166.) Dr. Holemon's clinical summary stated Hackett "had mixed elements of personality disturbance that may affect all relationships, but this does not constitute a disability," and would not preclude him from being capable of some form of work. (R. 004, 163.) Although Dr. Holemon's diagnosis differed from previous diagnoses, it does so with supportive facts. Dr. Holemon offers his diagnosis that Hackett is capable of performing some work based on "[Hackett's] failure to pursue treatment, his engagement in other productive pursuits, and the lack of my (sic) efforts to have [Hackett] work in over 10 years and in any varying work environment." (R. 078, 193.)

Additionally, Dr. Wolf's medical evaluation, based on a review of the record and supplemental medical information, supported the earlier evaluation of Dr. Holemon. Dr. Wolf stated there is evidence for a diagnosis of personality disorder with mixed features, but that Hackett is capable of returning to work in an alternate position. (R. 080-081, 234.) HI unequivocally states that its decision was based upon the evaluations of Dr. Holemon and Dr. Wolf. (See Defs.' Reply Mem. in Supp. of Mot. for Summ. J. and Resp. Mem. in Opp'n to Pl.'s Mot. for Summ. J., p. 15.)

Hackett fails to present any evidence or medical information to alter the evaluations of Dr. Holemon or Dr. Wolf. Hackett did submit an updated evaluation from Dr. Gerber which diagnosed Hackett's condition as worsening since 1998. But as Xerox points out, a plan administrator is not required to give controlling weight to the opinion of a treating physician. See Donato, 19 F.3d at 380. Even if HI's decision can be determined as medically incorrect, it does not make it unreasonable. See Mers, 144 F.3d at 1021; Ross, 159 F.3d at 1011-1012; Donato v. Metro. Life Ins., Co., 19 F.3d 375, 380 (7th Cir. 1994).

Hackett, in a rather convoluted manner, attacks the reasonableness of HI's decision on two fronts. First, Hackett makes numerous arguments in an attempt to undercut the reasonableness of HI's decision based on: (1) medical history; (2) claim history; and (3) the application of inappropriate LTD plan and definitions. (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., pp. 22-25; Pl.'s Reply Mem. in Supp. of Mot. for Summ. J., pp. 11-16.) Second, Hackett raises several arguments challenging the reliability and reasonableness of Dr. Holemon's and Dr. Wolf's medical opinions. (Id.) In support of these arguments, Hackett provides a number of "indisputable facts" for the court to consider.[7] In contrast, Xerox and HI contend that HI's determination was not arbitrary and

---

[7] In Plaintiff's Reply Memorandum in Support of His Motion for Summary Judgment, Hackett provides the following list of "indisputable facts" for the court to consider:

- Defendants' application of the wrong disability plan when evaluating whether to terminate Hackett's benefits;
- Defendants' failure to consider and weigh over ten years of medical opinions finding that Hackett's condition qualified as a disability under the applicable Plan, and the consistent decision of Disability Services, an Administrative Law Judge at the Social Security Administration, and other third-party administrators that Hackett's psychiatric disorder qualified as a disability under that Plan;
- Defendants' failure to consider and weigh the only credible evidence relating to Hackett's current medical condition, which was provided by Hackett's treating physician who determined that Hackett's condition had worsened since the decision by the ALJ;
- The application of the wrong disability definition by Defendants' "consulting" and not "independent" physicians;
- Defendants' failure to provide Hackett with the appeal and review process mandated by either the 1987 or the 1996 Plans;
- Defendants' failure to follow the requirements of the Service Agreement which is an instrument governing the Plan under ERISA;
- Defendants' failure to weigh, discount and/or disregard Dr. Holemon's opinion as a result of Dr. Holemon's failure to review Hackett's medical records before examining him in direct contravention of HI's instructions;
- Defendants' failure to weigh, discount and/or disregard Dr. Wolf's opinion because Dr. Wolf never examined Hackett
- Defendants' failure to provided any justification for deviating from the opinion of Gerber which is the only credible, current evaluation of Hackett's condition;
- Defendants' failure to provide a clear and understandable reason for terminating Hackett's disability benefits;
- Defendants' compilation of an incomprehensible record that does not support

capricious because it was based on the opinions of two independent, board certified psychiatrists. (Defs.' Reply Mem. in Support of Mot for Summ. J. and Resp. Mem. in Opp's to Pl.'s Cross-Mot. for Summ. J., pp. 14-16.) Xerox argues that the fact that Hackett may have been considered disabled previously "does not mean he forever remains disabled." (Id.) The court finds Xerox's arguments persuasive.

Initially, the court will deal with Hackett's attacks on Dr. Holemon's and Dr. Wolf's respective opinions because they are fundamental to the finding of reasonableness. Hackett specifically argues that HI's decision was arbitrary and capricious in its reliance on the opinions of Dr. Holemon and Dr. Wolf because: (1) it is unclear what definition of disability was used by those physicians, but it is clear they did not use the Plan definition; (2) Dr. Wolf and Dr. Holemon are HI consulting physicians and not independent medical examiners as claimed by Xerox; (3) Dr. Holemon reached his opinion before reviewing Hackett's ten years of medical history, and his "amended" opinion is clearly erroneous and contradicted by Dr. Wolf's opinion; (4) Dr. Wolf never examined Hackett; and (5) Dr. Wolf and Dr. Holemons' opinions conflict but both found that Hackett suffers from a psychiatric disorder. (Pl.'s Reply Mem. to Cross-Mot. for Summ. J., p. 12.) The court addresses these contentions below.

First, Hackett argues that Dr. Holemon and Dr. Wolf were not provided with the correct definition of disability and that they did not use the Plan definition. (Pl.'s Resp. Mem. In Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., pp. 22-23; Pl.'s

---

Defendants' decision to terminate Hackett's disability benefits and, in fact, contains records relating to a Joe Hackett rather than Plaintiff James Hackett.

(Pl.'s Mem. In Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., pp. 11-12.) All of these indisputable facts are addressed by the court in the various arguments that Hackett raises.

Reply Mem. to Cross-Mot. for Summ. J., p. 12.) The only evidence Hackett provides to support this argument is a reference to a statement made by Dr. Wolf. (Pl.'s Reply Mem. in Supp. of Cross-Mot. for Summ. J., p. 13.) That statement, "disabled as conventionally defined," is a single statement taken from the written medical opinion of Dr. Wolf concerning Hackett. (Id.) Hackett suggests the statement "disabled as conventionally defined," indicates that Dr. Wolf either never was informed of the appropriate definition of disability contained in the LTD plan or he chose to disregard it. This is entirely speculation on the part of Hackett. See Shank, 192 F.3d at 682; Navarro, 117 F.3d at 1030; see also Rand, 42 F.2d at 1146-47. Hackett's argument fails to demonstrate that the denial of disability benefits was unreasonable.

Another argument by Hackett is that neither Dr. Holemon nor Dr. Wolf are independent medical examiners. Hackett cites two pieces of evidence, a letter to Dr. Holemon from HI, and well as Dr. Holemon's Curriculum Vitae, to refute the fact he is an independent physician. (Pl. Reply Mem. in Supp. of Cross-Mot. for Summ. J., p. 13.) The letter to Dr. Holemon is a request for a consultation report and involves some discussion of reimbursement for services, while Dr. Holemon's Curriculum Vitae lists him as a consulting physician for Health International, Inc. (R. 102-103, 239.) The court is unclear how this undermines Dr. Holemon or Dr. Wolf's opinions, or this makes HI's decision unreasonable. Nor does Hackett argue exactly what the ramifications may be. See Shank, 192 F.3d at 682; Navarro, 117 F.3d at 1030. It is clear that Dr. Holemon and Dr. Wolf were paid to provide their medical opinions as to Hackett, and Dr. Holemon lists himself as a consulting physician. However, this is not evidence that they were not objective in their assessments nor independent in their analysis. Hackett's speculation about

their independence is not enough. See Rand, 42 F.2d at 1146-47. Again, Hackett argument fails to demonstrate that the denial of disability was unreasonable.

A third argument is that Dr. Holemon, whose alleged brief examination did not consist of either diagnostic test or prior review of medical records, would be unable to discern Hackett's psychiatric condition. Hackett states "a physician would not be able to discover the deep-seated nature of Hackett's psychiatric condition during such a casual acquaintance." (Pl.'s Reply Mem. in Supp. of Cross-Mot. for Summ. J., p. 14.) However, Hackett presents no evidence to support this statement. In fact, the psychological assessment by Louis E. Hemmerich, Ph.D., that Hackett relies on to support this statement does not state that a physician would be unable to discover Hackett's psychiatric condition. The assessment actually states:

> Mr. Hackett is a man of high intelligence and good physical condition who on casual acquaintance might appear well-adjusted and possessing the capacity for a high level of achievement in the realm of competitive employment. However, examination of his educational and employment history begins to reveal the long standing and deeply rooted nature of his pathology.

(R. 011-019, 063-071, 174-182.) What is known is that Dr. Holemon, a board-certified psychiatrist, after a 45-minute evaluation concluded that Hackett suffered from a psychiatric condition but was still able to work. (R. 002-010, 078, 160-166, 193.) What is more, Dr. Holemon's opinion eventually included a review of Hackett's medical records after his examination, including psychiatric and psychological evaluations previously performed. (R. 78, 193.) Hackett offers no evidence that Dr. Holemon's opinion was inappropriate nor that the denial of disability benefits was unreasonable. The evidence of record demonstrates that HI's evaluation was not arbitrary and capricious.

Hackett also argues that Dr. Wolf's opinion is of little value since Dr. Wolf did not physically examine Hackett. Again, Hackett cites no support for this argument. See Shank, 192 F.3d at 682; Navarro, 117 F.3d at 1030. Dr. Wolf had the benefit of reviewing the medical of history of Hackett that was contained in the administrative record. Hackett raises nothing that challenges the reasonableness of either Dr. Wolf's opinion or HI's decision.

Finally, Hackett argues that Dr. Holemon's opinion disagreed with and contradicted the opinion of Dr. Wolf, which ultimately undermines their credibility.[8] Again this is a conclusion without supporting authority. See Shank, 192 F.3d at 682; Navarro, 117 F.3d at 1030; see also Rand, 42 F.2d at 1146-47. Dr. Holemon and Dr. Wolf only differed slightly in their respective opinions, but both agreed that Hackett was capable of some form of work. The fact that Dr. Holemon and Dr. Wolf had differing aspects to each others' opinions only adds validity to them and the reasonable nature of HI's decision.

Hackett is unable to marshal any argument that persuades the court that HI's decision was unreasonable. Thus, the court finds that, in terms of the reliance on the opinions of Dr. Holemon and Dr. Wolf, HI's decision to deny disability status was not arbitrary and capricious.

Hackett also offers several general arguments why Xerox's decision was arbitrary. Only two of these arguments have any substance, whereas the others are overlapping from previous arguments and have been already addressed. Hackett argues that Xerox and HI failed to consider his previous medical and claim history. This history includes the Social Security

---

[8] Dr. Holemon diagnosed Hackett as suffering from a personality disorder as well as depression (in remission), but that Hackett was able to return to work. In fact in his evaluation, Dr. Holemon indicates that Hackett acknowledged he could return to work. Dr. Wolf diagnosed Hackett as suffering from personality disorder with mixed features (neurotic depression), but that he was capable of some form of work. (R. 002-010, 078, 080-081, 160-166, 193, 234.)

Administrations' determination that Hackett was disabled. Hackett's argument relies on the premise that the previous findings of disability preclude any future where Hackett would not be disabled. This is an unacceptable conclusion by Hackett and is unsupported by authority. See Shank, 192 F.3d at 682; Navarro, 117 F.3d at 1030; see also Rand, 42 F.2d at 1146-47. To suggest that no alternate evaluation or opinion to the medical and claim history exists, as well as a social security determination, is unreasonable in itself and reveals the allegation's lack of merit.

Hackett also asserts that HI doctors failed to provide any reasoning for their disagreements with previous medical opinions. The court is unaware of any such obligation in ERISA. See Halpin v. W.W. Grainger, Inc., 962 F.2d 685, 689-90 (7th Cir. 1992). Again, Hackett fails to provide any type of authority for this proposition. See Shank, 192 F.3d at 682; Navarro, 117 F.3d at 1030. And as previously discussed, both Dr. Holemon and Dr. Wolf provided their diagnoses. As a result, the decision is not arbitrary and capricious.

**4. Miscellaneous Contentions**

In several instances, Hackett attempts to invalidate the reasonableness of the decision to deny long-term disability benefits by raising collateral issues. Hackett alleges the following: (1) failure to provide full and fair review; (2) violation of a service agreement; (3) failure to provide requested materials; (4) conflict of interest; and (5) breach of fiduciary duty. Each allegation fails not only of its own accord, but when it is considered in relation to the reasonableness of the denial of long-term disability benefits.

### a. Full and Fair Review

Hackett alleges that Xerox and HI failed to provide a full and fair review as required when they failed to: (1) provide Hackett with the rationale for the benefits denial; (2) identify the additional material Hackett needed to perfect his claim; (3) consider evidence favorable to Hackett; (4) apply the proper disability definition; (5) promptly provide Hackett with material he requested to prepare his appeal; (6) follow the appeal procedures established by the Plan; and (7) provide Hackett with a comprehensible record. (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., pg. 26; Pl.'s Reply Mem. in Supp. of Mot. for Summ. J., p. 18.) Xerox argues that the key question is whether HI had a reasonable basis for its final determination, and that Hackett's arguments "do not cause HI's determination to be arbitrary and capricious or mean that [Hackett] was denied a full and fair review." (Defs.' Reply Mem. in Supp. of Mot. for Summ. J. and Resp. Mem. in Opp'n to Pl.'s Mot. for Summ. J., p. 23.) The court finds that Hackett did receive a full and fair review, and regardless of the review, HI's decision remains reasonable.

ERISA requires that "specific reasons for denial be communicated to the claimant and that the claimant be afforded an opportunity for 'full and fair review' by the administrator." Halpin, 962 F.2d at 688; see also Gallo v. Amoco Corp., 102 F.3d 918, 922-23 (7th Cir. 1996); Donato, 19 F.3d at 381. The particular provision of ERISA sets out the following duties for plan administrators:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair reveiw by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133; see also Halpin, 962 F.2d at 689. Further, several regulations also provide the

following in relation to the contents of the notice of claim denial:

(1) The specific reason or reasons for the denial;
(2) Specific reference to pertinent plan provisions on which the denial is based;
(3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and
(4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503-1(f); see also Halpin, 962 F.2d at 689. "These requirements insure that

when a claimant appeals a denial to the plan administrator, he will be able to address the

determinative issues and have a fair chance to present his case." Halpin, 962 F.2d at 689; see

also Gallo, 102 F.3d at 922-23; Donato, 19 F.3d at 381. "In determining whether a plan

complies with the applicable regulations, substantial compliance is sufficient. Halpin, 962 F.2d

at 690 (citing Brown v. Retirement Committee of Briggs & Stratton Retirement Plan, 797 F.2d

521, 536 (7th Cir. 1986); Sage v. Automation, Inc. Pension Plan & Trust, 845 F.2d 885, 892 (10th

Cir. 1988)); see also Gallo, 102 F.3d at 922-23; Donato, 19 F.3d at 382. "Every procedural

defect will not upset a trustee's decision." Halpin, 962 F.2d at 690 (quoting Wolfe v. J.C.

Penney Co., 710 F.2d 388, 393 (7th Cir. 1983)); see also Donato, 19 F.3d at 382. "The

application of these standards to a particular disability situation is necessarily a fact-intensive

inquiry." Halpin, 962 F.2d at 690.

First, Hackett argues that he received what he deems as "inadequate notice." The purportedly inadequate notice refers to the denial letter sent to Hackett and its failure to state a reason for the denial, and to identify any materials that could "perfect a claim." (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., pp. 26-30; Pl.'s Reply Mem. in Supp. of Mot. for Summ. J., pp. 18-20.) The original denial of benefits letter was sent to Hackett on January 22, 1999. (Compl., Ex. 7; R. 085, 108.) The document stated the reason for the denial of Hackett's disability as "not clinically supported." (Id.) Additionally, the document provided the definition of disability that is applicable to Hackett as well as his right to appeal the decision. (Id.) It is obvious that Hackett's claim failed because the current medical evidence indicated he was no longer disabled. Hackett at the time of the receipt of the notice of denial was in possession of the psychiatric evaluation done by Dr. Holemon in October of 1998. (R. 002-010, 078, 160-166, 193.) This evaluation states "Mr. Hackett has mixed elements of personality disturbance that may affect all relationships, but this does not constitute a disability in the sense outlined." (Id.) If the beneficiary was "supplied with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review" then the beneficiary was given adequate notice. Donato, 19 F.3d at 382 (citing 29 C.F.R. § 2560.503-1(f)). The denial notice, when combined with the medical evaluation of Dr. Holemon, more than adequately explains the denial. See also Benson v. Long Term Disability Income Plan For the Employees of Xerox, 108 F. Supp. 2d 1074, 1084 (C.D. Cal. 1999).

In terms of the identification of any material that could "perfect the claim," the denial letter did not directly state but was obvious, that the material necessary was medical evidence

that could show a total disability. See Halpin, 962 F.2d at 689. Hackett's actions, before and after the denial letter was received, indicate he understood what was required to perfect his claim. Hackett submitted to HI his medical records, including the record related to the Social Security Administration's determination of disability. Additionally, Hackett sought out Dr. Gerber for a current evaluation, even though Dr. Gerber had only seen him three times during the last three years. (R. 061-062, 169-171.) This is enough to balance the concerns of a full and fair review. Hackett's actions make it clear that Hackett was aware of exactly what was needed to "perfect his claim." Additionally, Hackett was represented by a lawyer throughout this process, who continually made requests for the relevant plan documents and copies of any medical examinations.[9] Based on all the abovementioned factors, the notice provided to Hackett is sufficient to allow a full and fair review. See Gallo, 102 F.3d at 922-23; Donato, 19 F.3d at 382.

Second, Hackett argues that the record is sloppy and incomplete and this violates the full and fair review requirement under ERISA. Hackett cites to several "deficiencies and irregularities," which he alleges question the development of a full and fair review. (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., pp. 30-33.) Xerox and HI contend that ERISA does not prescribe any standard for the administrative record and again that such complaints are ancillary to whether the denial of benefits was

---

[9] Mark E. Furlane represented James Hackett as of January 20, 1996. Mr. Furlane, a partner at Gardner, Carton, & Douglas, specializes in employment law, with emphasis in the areas of employment counseling and litigation. "Mr. Furlane has considerable experience in traditional labor counseling and practice matters, including representing clients before the NLRB, the ISLRB, and OSHRC, handling collective bargaining, labor arbitration and union avoidance matters, as well as litigation of employee benefits and ERISA claims." Gardner, Carton & Douglas webpage at http://www.gcd.com (last visited Nov. 16, 2001).

reasonable. (Defs.' Reply Mem. in Supp. of Mot. for Summ. J., pg. 22.) The court agrees with Xerox

There is no provision contained within ERISA which establishes specific requirements of the administrative record or a plan administrator in regards to the administrative record. Further, the court is unaware of any court case which specifically addresses requirements for the administrative record or a plan administrator in regard to the administrative record. Hackett puts forth <u>Vallone v. CNA Financial Corp.</u>, No. 98 C 7198, 2000 WL 1015936 (N.D. Ill. May 16, 2000), as authority to argue that ERISA mandates specific record requirements. Yet <u>Vallone</u> does not speak of specific requirements; rather, it speaks of the general requirement to include all "relevant" or "germane" material in the administrative record. <u>Id.</u> at *2. Additionally, <u>Vallone</u> addresses the administrative record in a light of motion for discovery and not a motion for summary judgment. <u>Id.</u> at *1-2.

Hackett presents several alleged examples of deficiency and irregularities, but these examples do not convince the court that the record, as a whole, was violative of ERISA. Hackett alleges that a document, a fax cover sheet received by HI (R. 009), indicates that it should be followed by attachments, yet it is not. (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., p. 31.) Hackett states this is evidence that the record is deficient. However, the document refers to the psychiatric evaluation performed by Dr. Holemon in October of 1998, which is included in the record, not once but twice. (R. 002-008, 160-166.) Hackett also cites to a letter sent by him to HI that was not included in the record. (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., p. 31.) The letter advised HI that Xerox had previously determined Hackett unfit to

work and had even provided an attorney to represent him during the Social Security Administration disability hearing. It is unclear to the court how this single letter is relevant when the administrative record includes the actual records from the Social Security Administration. (R. 029-037.) Another example of irregularity Hackett cites is the affidavit of Ms. Mary Jo Jerde ("Jerde") concerning the record. (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., pp. 31-32.) Jerde's affidavit states that the record contains documents that were "before HI at the time it made its final determination." (Defs.' Rule 56.1 Statement, Ex. 2, p. 1.) Hackett believes that Jerde's statement is contradicted by the fact the record includes several documents after the date the final determination is made. (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., pp. 31-32.)

Jerde's affidavit does state that the administrative record submitted as Exhibit 2B to Defendants' Local Rule 56.1 statement is the administrative record that was before HI for the final determination on January 29, 1999. (Defs.' Rule 56.1 Statement, Ex. 2, p. 1.) Jerde's affidavit goes on to state that Hackett's claim was reviewed through the appeal process up until May of 1999. (Defs.' Rule 56.1 Statement, Ex. 2, p. 2.) As of May of 1999, according to Jerde's affidavit, Hackett's appeal was exhausted, but a clerical error led to a letter being sent on May 5, 1999, informing Hackett of one more level of appeal. (Id.) Jerde's affidavit confirms that a revised determination notice was sent on June 4, 1999. (Id.) Further, the affidavit states that all documents that Hackett provided were given consideration. (Id.) Thus, Hackett's allegation has no merit because there is not a contradiction.

Hackett also questions what exact parts of the record HI used to arrive at its determination, how the records were used to deny benefits, who reviewed the record, and ultimately, who made the disability decision relating to Hackett. (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., p. 32.) Hackett submits no support or authority for this argument. See Shank,192 F.3d at 682, Navarro, 117 F.3d at 1030. Again, ERISA requires only that a reason be stated why the claim is denied. See Halpin, 962 F.2d at 689-90. Nowhere in ERISA is it required to reveal the exact parts of the record used, how the records were used, who reviewed the records, and who made the disability decision. See Donato, 19 F.3d at 922; Halpin, 962 F.2d at 689-90.

Third and finally, Hackett alleges that Xerox and HI failed to provide the appeal and review process mandated by either the 1987 Policy or the 1996 Plan.[10] (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., pp. 33-35.)

Hackett states that a service agreement, which was executed between Xerox and HI on November 26, 1996 provides for three levels of appeal. (Defs.' Rule 56.1 Statement, Ex. 2A, p. 1.) Hackett cites the three level of appeals as: (1) the current medical director evaluates whether a plan participant's medical condition qualifies as a disability under the applicable plan definition of disability; (2) an independent medical examination or a physician's consultation; and (3) the case be sent to a new consulting physician to determine whether the plan participant's condition qualifies as a disability under the applicable plan definition. (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., p.

---

[10] As discussed previously, the 1996 Plan is the plan that is in effect. (See supra, pp. 8-18.) Further, the 1987 Policy does not vest rights, so any discussion of appeal or review process under the 1987 Policy is moot. (See supra, pp. 15-18.)

34.) As will be discussed (see infra, pp. 36-37), the service agreement is not the LTD Plan. Regardless, HI provided an appeal process for Hackett which complied with the service agreement.

HI, the medical case manager, determined that Hackett no longer met the definition of disabled. Hackett was then examined by Dr. Holemon in October of 1998. (R. 002-010, 160-166.) Dr. Holemon was hired by HI to perform an independent medical exam. (R. 040.) Dr. Holemon determined Hackett was no longer totally disabled as defined and issued a report on November 19, 1998. (R. 002-010, 040, 160-166.) After Hackett had submitted additional information and records, Dr. Holemon reviewed his conclusion and issued a written addendum on December 15, 1998 to his November 19th report. (R. 078, 193.) On, January 22, 1999 HI sent Hackett a letter denying disability benefits with the stated reason as "continuing disability not clinically supported." (R. 112, 132, 147, 217.) The denial letter also indicated Hackett could appeal. Hackett requested the appeal on March 10, 1999. (R. 040.) All information and records were then sent to Dr. Wolf for his review. This was the third level of review. Dr. Wolf indicated that Hackett was able to return to work. (R. 081-082, 234.)

On May 5, 1999 a final determination was made and a denial letter sent out with the stated reason as "continuing disability not clinically supported." (R. 112, 132, 147, 217.) Unfortunately, the denial letter inadvertently and incorrectly offered Hackett another opportunity to appeal. (Id.) This denial letter was amended by another letter dated June 4, 1999 which denied disability again and was a final and binding decision.[11] Hackett has not presented any

---

[11] The June 4th letter states the denial of the disability based on "Consulting physician did not concur." Hackett asserts that this is makes HI's decision unreasonable because it switched the basis for its denial. It is not unreasonable and does not change the reasons. The June 4th letter is a corrective letter sent by HI and the decision was already final and binding after the May 5th letter.

evidence which would convince the court that he did not receive a full and fair review.  See Shank, 192 F.3d at 682; Navarro, 117 F.3d at 1030.  Hackett's argument to the contrary does not change the fact that HI's decision to deny disability benefits was reasonable.

### b. Violation of Service Agreement

Hackett also alleges that Xerox and HI disregarded a service agreement between them which warrants a reversal of the denial of disability benefits.  The agreement in question was executed on November 26, 1996.  (Defs.' Rule 56.1 Statement, Ex. 2A, p. 1.).  The purpose of the agreement was to provide a medical case manager to determine eligibility for benefits, process claims under the plan, and to perform the duties of the plan administrator to the extent specified in the agreement.  (See id.)

Hackett argues that both Xerox and HI "blatantly disregarded the requirements contained in the Service Agreement," and by doing so essentially ignored the plan.  (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., p. 39.) Hackett specifically argues that HI's violation occurred as a result of the failure to follow conditions stated in the agreement in order to terminate disability status.  (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., pp. 36-39.) Hackett cites to Section 7.2 of the 1996 Plan as the method in which the service agreement is incorporated into the 1996 Plan.  Section 7.2 of the 1996 Plan states:

> The Company (or in the absence of action by the Company, the Plan Administrator) may by written instrument appoint a medical case manager or a Disability Administrator (which may be an insurance company) or both, to construe the terms of the Plan and determine eligibility for benefits, process claims under the plan,

---

HI made clear that the reason for the denial was that Hackett's disability was not clinically supported.  (See infra, pp. 28-35.)

and to carry out any and all of the Plan Administrator's administrative or other duties under the Plan to the extent specified in such instrument.

(Compl., Ex. 2, p. 15.)[12] Xerox counters that the service agreement is not part of the LTD plan. (Defs. Reply Mem. in Supp. of Mot. for Summ. J. and Resp. Mem. in Opp'n to Pl.'s Cross-Mot. for Summ. J., pp. 23-24.) Xerox argues that "if HI breached the Service Agreement, Xerox may have a cause of action against HI, but such a 'breach' does not in any way entitle plaintiff to a different standard of review or a finding that HI's determination was arbitrary or capricious." (Id.); see also Benson, 108 F. Supp.2d at 1082. The court is unpersuaded by Hackett's arguments.

As stated previously, the terms of ERISA plans sometimes "must be inferred from a series of documents none clearly labeled as 'the plan.'" Health Care Controls, 187 F.3d at 712 (referring to Milwaukee Area Joint Apprenticeship Training Comm., 67 F.3d at 1338; Horn, 938 F.2d 125). Courts must look to surrounding evidence to establish the plan. See Health Cost Controls, 187 F.3d at 712. This court will do likewise to determine if the service agreement is part of the LTD plan.

Hackett fails to present any evidence that would lead this court to the conclusion that the service agreement should be considered part of the LTD plan. See Health Cost Controls, 187 F.3d at 712. Hackett does not cite substantive evidence to prove that the service agreement was part of the LTD Plan. See id. What Hackett does cite is a portion of the 1996 Plan that establishes a medical case manger. This has no bearing on whether the service agreement is

---

[12] Additionally, Hackett again attempts to reargue whether the 1996 Plan demands a de novo review, which the court will not revisit. (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., p. 36.)

incorporated in the LTD plan. Any agreement between Xerox and HI, that may have imposed duties on HI outside of ERISA or the LTD plan, is not automatically considered part of the LTD plan. Further, even if a violation of the service agreement occurred it does not impact the courts' decision whether the denial of Hackett's disability benefits was reasonable. See Benson, 108 F. Supp. 2d 1074.

### c. Failure to Provide Requested Plan Materials

Additionally, Hackett alleges that Xerox and HI failed to provide him with requested plan materials in violation of 29 U.S.C. § 1132(c). Under 29 U.S.C. § 1024(b)(4) the following is provided:

> [T]he administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description,, [sic] and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instrument under which the plan is established or operated.

29 U.S.C. 1024(4)(b). A violation of this section subjects a plan administrator to the potential of a penalty under § 502(c) of ERISA, which grants a reviewing court discretion:

> to impose a penalty of up to $100 a day on a plan administrator – payable to the participant or beneficiary who submitted a written request to the administrator – when it finds that the administrator "fail[ed] or refuse[d] to comply with a request for any information which such administrator [was] required by this subchapter to furnish . . . unless such failure or refusal result[ed] from matters reasonably beyond the control of the administrator . . . ."

29 U.S.C. § 1132(c). The purpose of ERISA's penalty provision is "not so much to penalize as to induce plan administrators to respond in a timely manner to a participant's request for information." Winchester v. Pension Comm. of Michael Reese Health Plan, Inc., 942 F.2d 1190,

38

1193 (7th Cir. 1991). A request for documents under § 1024(b)(4) necessitates a response from the plan administrator when the request provides clear notice of what information the beneficiary desires. Anderson v. Flexel, Inc., 47 F.3d 243, 248 (7th Cir. 1995) (citing Moothart v. Bell, 21 F.3d 1499, 1503 (10th Cir. 1994); Curry v. Contract Fabricators Profit Sharing Plan, 744 F. Supp. 1061, 1066 (M.D. Ala. 1988), aff'd, 891 F.2d 842 (11th Cir. 1990)). The request need not ask for specific documents by name, and an administrator cannot use such technical consideration as an excuse for its failure to respond. Anderson, 47 F.3d at 250 (citing Bartling v. Fruehauf Corp., 29 F.3d 1062, 1071 (6th Cir. 1994)). In determining whether to award a penalty for a disclosure violation under ERISA, the court should consider the conduct and intent of the administrator in not providing the relevant information, and the harm or prejudice suffered by the participant from the administrator's failure to furnish the required information. See Harsch v. Eisenberg, 956 F.2d 651, 662 (7th Cir. 1992). Under § 502(c) the award is committed to the discretion of the court, which may, but need not, consider any provable injury when exercising that discretion. See id. If the court ultimately decides to impose a fine, the statute commits the size of the penalty to the court's discretion. Ziaee v. Vest, 916 F.2d 1204, 1210-11 (7th Cir. 1990). A plan administrator's duty, under the aforementioned provisions of ERISA, is to a defined set of documents. See Ames v. American National Can Company, 170 F.3d 751, 758 (7th Cir. 1999). The provisions do not require production of all documents relevant to a plan. Id. at 758-59. And if litigation comes along, then ordinary discovery rules under the management of the district court provide the limits on what must be produced. Id.

Hackett argues that of the twelve documents he requested, which Xerox does not dispute, none were provided within the 30-day time limit under ERISA.[13] (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., pp. 39-43; Pl.'s Reply Mem. in Supp. of Mot. for Summ. J., pp. 24-26.) Hackett calculates, including 30-day periods for every new request, the delays as spanning anywhere from 3 days to 179 days. (Id.) Ultimately, Hackett tallies the total penalties in excess of $168,000 at a minimum, and $443,000 at the maximum. (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., p. 39.) Xerox argues that even though these documents were provided to Hackett beyond the 30-day limit imposed by ERISA, such delays did not prejudice Hackett in regards to his claim for denial of a disability benefit. (Def. Reply Mem. in Supp. of Mot. for Summ. J. and Resp. Mem. in Opp'n to Pl.'s Cross-Mot. for Summ. J., pp. 26-28.) Xerox argues the denial of Hackett's disability benefit relies upon medical evaluations and this has little to do with a majority of the documents requested. (Id.)

The court has discretion in determining whether to penalize a plan administrator for failure to timely provide plan materials. See Harsch, 956 F.2d at 662. More significantly, it is necessary to analyze if Hackett suffered any prejudice as a result of the delay. See id. Of the documents Hackett requested, only two actually deal with long-term disability benefits, the LTD plan and the LTD summary plan description ("SPD"). However, Hackett does not demonstrate

---

[13] Hackett claims the following document were requested: (1) current long-term disability plan; (2) current medical plan; (3) current profit sharing plan; (4) current pension plan; (5) current employee stock ownership plan; (6) current Form 5500 annual report; (7) current statements of benefits; (8) current long-term disability summary plan description ("SPD"); (9) current medical plan SPD; (10) current profit sharing plan; (11) current pension plan SPD; (12) current employee stock ownership plan SPD. (Pl.'s Resp. Mem. in Opp'n to Mot. for Summ. J. and in Supp. of Cross-Mot. for Summ. J., p. 40.).

any prejudice that stemmed from the delay in the production of these two documents, or any other documents. Hackett states that the delay forced him to "file his appeal of the benefits denial without having seen critical materials that he had requested for purposes of preparing that appeal." (Pl.'s Resp. Mem. in Opp'n to Def. Mot. for Summ. J. and Mem. in Supp. of Def. Cross-mot. for Summ. J., p. 42.) This begs the question, what are the critical materials? Hackett fails to specifically identify any such critical material or provide exhibits of such. Furthermore, Hackett fails to explain why the materials are critical. The one example of critical material that Hackett does provide is the 1977 Plan. (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. for Summ. J. and Mem. in Supp. of Cross-Mot. for Summ. J., pp. 42-43.) Hackett indicates the 1977 Plan is critical because without it he is unable to fully evaluate the benefits owed him. However, the 1996 Plan is the applicable plan since it is the LTD plan in effect when Hackett was disabled. Additionally, this is contradictory of Hackett's argument that the 1987 Policy is the LTD Plan in effect (why would the 1977 Plan be critical when the 1987 Policy provides the benefits owed). Hackett presents no evidence that he suffered any prejudice due to the delay in production of documents by Xerox. See Harsch, 956 F.2d at 662. Thus, the court, in its discretion, declines to award a penalty under § 1132(c).

### d. Conflict of Interest

Hackett also argues that HI has a "inherent" conflict of interest which makes any determination to deny disability suspect and not reviewable at a deferential standard. A court must presume a fiduciary is acting neutrally unless a claimant can show otherwise by providing specific evidence of actual bias or a significant conflict of interest. Mers, 144 F.3d at 1020 (citing Cuddington v. Northern Ind. Public Serv. Co., 33 F.3d 813, 816 (7th Cir. 1994); Van

Boxel, 836 F.2d at 1051, 1053). The existence of potential conflict is not enough. Mers, 144 F.3d at 1020 (citing Cuddington, 33 F.3d at 816). Hackett's conjecture that a such a conflict exists for HI falls well short of convincing the court that an actual conflict exists. In fact, the evidence offered by Xerox and HI shows that no conflict exists. The evidence establishes that: (1) HI does not pay any LTD plan benefits; (2) Xerox pays all LTD plan benefits from its own assets; (3) HI's compensation is not dependent upon whether it approves or disapproves a claim assets; and (4) Xerox does not participate in the determination whether someone is medically qualified to receive disability benefits. (Defs.' Rule 56.1 Statement, Ex. 1, p. 1.) This is uncontradicted by Hackett.[14] Hackett offers the argument that he was "precluded" from discovery that would allow him to substantiate his claim. This is a disingenuous statement when no amount of discovery could have overcome the abovementioned uncontradicted evidence. The court finds there is no conflict of interest

### e. Breach of Fiduciary Duty

Another claim Hackett presents involves a claim under § 502(a)(3) of ERISA, codified at 29 U.S.C. 1132(a)(3). Specifically, Hackett alleges that Xerox breached its fiduciary duty in not monitoring, and if necessary correcting, the actions of its plan administrator and HI in terms of the disability benefits claims. (Pl.'s Resp. Mem. in Opp'n to Defs.' Mot. for Summ. J. and in Supp. of Cross-Mot. for Summ. J., pp. 43-46.) Hackett seeks reinstatement of disability status,

---

[14] Hackett will not be heard to argue that he contradicted Mr. Lawrence Becker's affidavit in terms of the evidence of the lack of interest HI had in approving or disapproving claims. While it is true that Hackett sought to strike Mr. Becker's affidavit, Hackett's motion to strike was based on an argument that Mr. Becker did not have any personal knowledge of the facts since he was not serving as plan administrator with Xerox during the time Hackett's disability status was denied. The court has denied Hackett's motion to strike Mr. Becker's affidavit. Further, Xerox has submitted several amended affidavits of Mr. Becker's which cure any alleged deficiences.

reversal of denial of continuing benefits, reinstatement of any other benefits along with interest, restitution, attorney fees, injunctive relief, and any other appropriate relief. (Compl., p. 18.) Xerox counters that Hackett cannot assert such a claim under § 502(a)(3) since there is an adequate remedy of law. (Defs. Reply Mem. in Supp of Mot. for Summ. J. and Resp. Mem. in Opp'n to Pl.'s Cross-Mot. for Summ. J., pp. 24-26.)

Section 502(a)(3) of ERISA, imposes a duty on plan fiduciaries to act "solely in the interest of participants and beneficiaries." 29 U.S.C. § 1132(a)(3); see Pegram v. Herdrich, 530 U.S. 211, 223 (2000). "Where a plan administrator breaches its fiduciary obligations to individual beneficiaries of its plan and thereby causes them injury, § 502(a)(3) may provide those individuals beneficiaries with a private claim for equitable relief. Nilles v. Sears, Roebuck & Co., No. 96 C 4613, 1997 WL 610339 at *5 (N.D. Ill. Sept. 29, 1997) (citing Varity Corp. v. Howe, 516 U.S. 489, 508-11 (1996)); see also Pegram, 530 U.S. at 223. The plan beneficiaries must be provided with no other adequate relief under ERISA. Nilles, 1997 WL 610339 at *5 (citing Varity, 516 U.S. at 514-15). A plaintiff cannot maintain a breach of fiduciary claim pursuant to § 502(a)(3), 29 U.S.C. § 1132(a)(3), if they can avail themselves of section 1132's other remedies. White v. Sunstrand Corp., No. 98 C 50070, 2000 WL 713739 at *12 (N.D. Ill. May 23, 2000) (citing Varity, 516 U.S. at 515) (where Congress elsewhere provided adequate relief, there will likely be no need for further equitable relief) (citations omitted)).

Hackett argues that Xerox had a fiduciary duty and it failed to perform that duty when it "turned [its] cheek when it saw an opportunity to further its efforts in reducing it[s] overhead, resulting in a serious conflict of interest." (Pl.'s Resp. Mem. in Opp'n to Def. Mot. for Summ. J. and Mem. in Supp. of Def. Cross-mot. for Summ. J., pp. 45-46.) According to Hackett, this

alleged breach permits a claim of a violation under § 502(a)(3) regardless if there is a claim for benefits under ERISA. Hackett relies on Varity and Parente v. Bell Atlantic, No 99-5478, 2000 WL 419981 (E.D. Pa. April 18, 2000) as support for this argument. Xerox simply argues that § 502(a)(3) "allows equitable relief and equitable relief is available only when an adequate remedy is not." (Defs.' Reply Mem. in Supp. of Mot. for Summ. J and Resp. Mem. in Opp'n to Pl.'s Mot. for Summ. J., p. 26.) The court finds the argument of Xerox persuasive.

The case law is clear. As Xerox points out, the Fourth, Fifth, Eighth, and Ninth Circuits, as well as at least one court in the Northern District of Illinois have held that § 502(a)(3) allows only equitable relief, and such relief is only available when an adequate remedy at law is not. See White, 2000 WL 713739 at *12; see also Bowles v. Reade, 198 F.3d 752, 759-60 (9th Cir. 1999); Bratton v. National Union Fire Ins. Co. of Pittsburgh, 215 F.3d 516, 526 (5th Cir. 2000); Rhorer v. Raytheon Engineers and Constructors, Inc., 181 F.3d 634, 639 (5th Cir. 1999); Forsyth v. Humana, Inc., 114 F.3d 1467, 1475 (9th Cir. 1997); Wald v. Southwestern Bell Corp. Customcare Medical Plan, 83 F.3d 1002,1006 (8th Cir. 1996); Coyne & Delany Co. v. Blue Cross & Blue Shield of Virginia, Inc., 102 F.3d 712, 714-15 (4h Cir. 1996). Hackett has failed to demonstrate, or even discuss, that there is not an adequate remedy at law. Hackett merely states that there is not an adequate remedy at law, but that is not enough. See Shank, 192 F.3d at 682; Navarro, 117 F.2d at 1030. Hackett's claim of a breach of fiduciary duty is without merit.

### III. CONCLUSION

For the foregoing reasons, Defendant's motions for summary judgment is granted. The discretionary language included in the 1996 Plan, which is the plan that was in effect at the time of the denial of disability benefits, calls for the application of an arbitrary and capricious standard. Application of the arbitrary and capricious standard reveals that Xerox was entitled to summary judgment based on the reasonableness of their decision. None of Hackett's collateral arguments, including arguments involving full and fair review, violation of a service agreement, failure to provide required plan materials, conflict of interest, and breach of fiduciary duty, alter the reasonableness of the decision to deny disability benefits.

IT IS SO ORDERED

ENTER:

_____

CHARLES RONALD NORGLE, SR. Judge

United States District Court

DATED: _12-13-01_